RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0217p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MARK CHARLTON-PERKINS,

                              *Plaintiff-Appellant*,

   *v.*                                                              No. 25-3693

UNIVERSITY OF CINCINNATI; KENNETH PETREN, in his
official and individual capacities; GEORGE UETZ, in
his official and individual capacities,

                              *Defendants-Appellees*.

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:20-cv-00179—Timothy S. Black, District Judge.

Argued:  May 27, 2026

Decided and Filed:  August 5, 2026

Before: SILER, BUSH, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Marc D. Mezibov, MARC D. MEZIBOV, LLC, Cincinnati, Ohio, for Appellant.
Evan T. Priestle, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellees.
**ON BRIEF:**  Marc D. Mezibov, MARC D. MEZIBOV, LLC, Cincinnati, Ohio, for Appellant.
Evan T. Priestle, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellees.

      BUSH, J., delivered the opinion of the court in which SILER and MURPHY, JJ.,
concurred.  MURPHY, J. (pp. 26–32), delivered a separate concurring opinion.

---

**OPINION**

---

JOHN K. BUSH, Circuit Judge.    While living in the United Kingdom, Dr. Mark Charlton-Perkins applied for an assistant professor position at the University of Cincinnati. A faculty panel recommended him for the position, but after consternation about his gender and an alleged conflict of interest, the University cancelled the job search.  Charlton-Perkins brought Title IX and equal-protection claims against the University and two of its administrators.  The district court granted summary judgment to Defendants on all claims.  Because Title IX protects only persons in the United States, and because sovereign and qualified immunities bar his equal-protection claims, we **AFFIRM** the judgment of the district court.

**I.**

Dr. Mark Charlton-Perkins is a United States citizen who was born in South Africa. Later he resided in the United States, where he received his PhD in molecular and developmental biology from the University of Cincinnati.  In 2015, he moved to the United Kingdom to work as a research assistant at the University of Cambridge.  At all times relevant to this case, he resided in the United Kingdom despite being a United States citizen.

In September 2017, the University of Cincinnati's biology department began a hiring search for a new assistant professorship in cell biology.  Dr. George Uetz, the Head of the Biology Department, appointed four of the department's professors to a search committee.  He chose one of those professors, Dr. Elke Buschbeck, to chair the committee.  The committee interviewed candidates, ranked them, and provided a hiring recommendation to Uetz.  Uetz was responsible for sharing the committee's findings with—and presenting its recommendation to— the Dean of the College of Arts and Sciences, Dr. Ken Petren.  The Dean had sole authority to approve hires or cancel a search.

Charlton-Perkins applied for the position.  Even before the application, Buschbeck was familiar with Charlton-Perkins's work, having served on his doctoral thesis advisory committee and coauthored multiple scientific publications with him.  Sensing that this preexisting

relationship could create an appearance of favoritism, Buschbeck told a University administrator and the rest of the search committee about her ties to Charlton-Perkins after he interviewed over Skype. The administrator advised Buschbeck that the relationship did not create a conflict of interest.

Charlton-Perkins then survived successive rounds of cuts before interviewing in-person in Cincinnati in February 2018. As part of the interview, he gave an hour-long seminar and met with the search committee and Uetz. After this, the committee narrowed its search to four candidates—two women and two men—including Charlton-Perkins. Eventually, by a three-to-one vote, the search committee settled on Charlton-Perkins as its top choice for the position.

This endorsement was shared with Uetz. At the same time, Uetz also received feedback about Charlton-Perkins's candidacy from faculty members not appointed to the search committee, most of which was negative. Some comments concerned Buschbeck's potential bias toward Charlton-Perkins. Others concerned his race and gender. One faculty member expressed concern to Uetz that Charlton-Perkins, a white male, "would not provide [a] much-needed increase in diversity." R. 31-6, Ex. to Buschbeck Dep., PageID 1028. Similarly, another detractor told Uetz that Charlton-Perkins "brings the opposite of diversity and . . . demographics" as a candidate. R. 29, Uetz Dep., PageID 473. Finally, an email, described by Uetz as "encapsulat[ing]" the views of several faculty members, discounted Charlton-Perkins's candidacy for his inability to bring diversity to the department. R. 29-15, Ex. to Uetz Dep., PageID 736. The email's author also complained that Buschbeck's advocacy for Charlton-Perkins frustrated the overall aim "of hiring women." *Id.*

Uetz conferred with Petren, expressing concerns about "[t]he political climate" and "posturing regarding affirmative action" and asking if it were permissible to hire a man over two well-qualified female candidates. R. 29, Uetz Dep., PageID 430. Petren responded that hiring a man would be permissible. Uetz also raised the conflict-of-interest issue, and Petren directed him to investigate further. During Uetz's investigation, six faculty members expressed concerns about Buschbeck's relationship with Charlton-Perkins and her advocacy for his hiring.

Despite receiving a clear recommendation from the search committee, Petren and Uetz put the hiring decision on hold.  In early March 2018, Uetz informed the search committee that he and Petren wanted to shift away from Charlton-Perkins and "focus on the women candidates first."  R. 50-1, Statement of Undisputed Material Facts, PageID 1646.  That did not sit well with Buschbeck.  She protested that this emphasis on hiring women was "plain discrimination" against Charlton-Perkins and might even constitute illegal gender discrimination.  R. 31, Buschbeck Dep., PageID 895.  Uetz responded that he did not think that the hiring approach was illegal and emphasized that Buschbeck, as head of the search committee, "would need to make the case why a male candidate should be hired over a qualified female candidate."  R. 29-19, Ex. to Uetz Dep., PageID 750.  Soon after, Petren met with Buschbeck and told her that he decided not to follow the search committee's vote in part because "[b]iology is short on women," so "he thought that it would be better to go with a female candidate."  R. 31-15, Ex. to Buschbeck Dep., PageID 1064.  Petren also cited the perceived conflict of interest and the divided support of the faculty beyond the search committee as factors influencing his decision.

But later Petren had second thoughts.  Rather than proceed with hiring for the new position, Petren cancelled the search altogether and informed the faculty a few days later.  Uetz noted that factors supporting the no-go decision included "the gender of the candidates" and the conflict-of-interest concerns raised by faculty members.  R. 29-13, Uetz Notes, PageID 728; *see also* R. 29-14, Uetz Timeline, PageID 731 ("gender balance of the department" was a factor involved in the decision to "focus first on the two women candidates").

A week later, Petren and Uetz met with the faculty regarding the hiring-search cancellation.  Buschbeck's perceived conflict of interest was discussed, but Uetz also emphasized that the biology department was "bereft of female candidates" and that this concern played into the department's decision.  R. 29-7, Meeting Tr., PageID 662.  Petren then defended the decision to cancel the search rather than cure the perceived conflict of interest.  He argued that, of the three candidates considered good enough to be hired (Charlton-Perkins and the two female candidates), "whoever [was] not offered . . . could come back and . . . file a lawsuit.  And this happens all the time.  You know, we settled one for about [$]250,000 . . . .  Couple months ago it was [$]120,000."  *Id.* at PageID 664.  To Petren, the threat of potential litigation was

compounded by the fact that "so many accusations" had "flown around" and that, during the process, "emails just started flying with a lot of accusations that can't be undone." *Id.*

Soon after the contentious faculty meeting, Petren emailed Charlton-Perkins to inform him of the decision to cancel the hiring search. The position has never been reposted.

Charlton-Perkins sued, asserting a claim against the University under Title IX of the Civil Rights Act and claims against Uetz and Petren (in their individual and official capacities) under the Equal Protection Clause via 42 U.S.C. § 1983. He sought injunctive relief requiring his instatement as Assistant Professor of Cell Biology as well as compensatory and punitive damages.

Defendants moved for summary judgment.[1] The district court granted summary judgment to the University on the Title IX claim and dismissed the equal-protection claims with prejudice. The district court held that the Eleventh Amendment barred the official-capacity equal-protection claims and that qualified immunity barred the personal-capacity equal-protection claims. It further held that all of Charlton-Perkins's claims failed because he could not show that Defendants' proffered reason for cancelling the job search—the alleged conflict of interest—was pretextual.

Charlton-Perkins timely appealed.

## II.

We review de novo a grant of summary judgment. *Bilyeu v. UT-Battelle, LLC*, 154 F.4th 396, 402 (6th Cir. 2025). This includes grants of sovereign and qualified immunities. *Mingus v. Butler*, 591 F.3d 474, 481 (6th Cir. 2010); *Clemons v. Couch*, 3 F.4th 897, 902 (6th Cir. 2021). A defendant is entitled to summary judgment when, viewing the facts in the light most favorable to the plaintiff and drawing all reasonable inferences in the plaintiff's favor, no genuine dispute of material fact exists, and the defendant is entitled to judgment as a matter of law. *Bilyeu*, 154

---

[1]The district court previously dismissed the suit at the pleadings stage, holding that Charlton-Perkins's claims were not ripe and that he had failed to state a claim. On appeal, we reversed and remanded, holding that the district court had improperly grafted the prima-facie-case requirement onto the ripeness requirement and that Charlton-Perkins's claims were ripe for review. *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1058–60 (6th Cir. 2022). We also held that Charlton-Perkins had properly pleaded his claims. *Id.* at 1060–64.

F.4th at 402.  A genuine dispute of material fact exists when the record presents enough evidence for a reasonable jury to find for the plaintiff.  *Id.*  We can affirm "on any grounds supported by the record, even if different from those relied on by the district court."  *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999) (per curiam).

**III.**

We begin with the Title IX claim.  Charlton-Perkins appeals the district court's finding that this claim fails because he has failed to show sufficient evidence of pretext.  We affirm the district court, but on different grounds: when the alleged discrimination took place and Charlton-Perkins learned of it, he was not a "person in the United States" within the meaning of Title IX.[2]

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  Whether a United States citizen living abroad at the time of the alleged discrimination can claim the protection of Title IX is a question of first impression for our circuit, so we must engage in first-principles statutory interpretation.  Our "proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself."  *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019).  That requires "analyzing the statutory language, assuming that the ordinary meaning of that language accurately expresses the legislative purpose."  *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009)) (cleaned up).  If "the language of the statute is clear," we "appl[y] the statute as written."  *In re Corrin*, 849 F.3d 653, 657 (6th Cir. 2017).

---

[2]The Supreme Court recently granted certiorari to resolve a circuit split over whether Title IX provides a cause of action for employment discrimination.  *See Crowther v. Bd. of Regents of the Univ. Sys. of Ga.*, No. 25-183, 2026 WL 1377024 (U.S. May 18, 2026).  Charlton-Perkins's claim fails on the merits, and the lack of a cause of action is not jurisdictional, *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002), so we need not address the issue.

As relevant here, at the time of Title IX's enactment, "in" was most commonly "used as a function word to indicate location or position in space or in some materially bounded object." *In*, *Webster's Third New International Dictionary* 1139 (def. 1.a(1)) (1966). This plainly supports the interpretation that "in the United States" is a geographical requirement. True, "in" was also "used as a function word . . . to indicate the fact of belonging to a group or association." *Id.* (def. 1.b(1)). But this use of the word does not match how an ordinary person would read the statute. For example, Babe Ruth is *in* the Baseball Hall of Fame despite not being buried in Cooperstown. Is a citizen like Charlton-Perkins *in* the United States in the same way a member of the Baseball Hall of Fame is *in* the Hall of Fame? Answering "yes" would stretch ordinary usage too far. Nobody would say "I am in the United States" to refer to his citizenship status, and responding that way to a question about citizenship status would likely lead the asker to repeat his question. So the ordinary meaning of "person in the United States" is a person physically located within United States territory.

The Supreme Court's recent decision in *Trump v. Barbara* confirms this. 609 U.S. ___ (2026) (slip op.). In *Barbara*, the Court interpreted the meaning of the Citizenship Clause of the Fourteenth Amendment, which provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States . . . ." U.S. Const. amend. XIV, § 1. The Court interpreted the beginning of the Clause, "born . . . *in the United States*," to refer to "territory." *Barbara*, slip op. at 10 (quoting U.S. Const. amend. XIV, § 1) (emphasis added). And it relied on "the Clause's *territorial* focus on those born *'in' the United States*" to determine that the next requirement of the Citizenship Clause, being "subject to the jurisdiction thereof," referred to "liv[ing] under" our government's "dominion." *Id.* at 11 (emphasis added) (cleaned up).

The Supreme Court adopted a similar textual interpretation in another recent decision, *Mullin v. Al Otro Lado*, 609 U.S. ___ (2026) (slip op.). There, the Court considered "whether an alien who seeks to enter the United States from Mexico 'arrives *in* the United States' when he or she is still *in* Mexico." *Id.* at 1 (footnotes omitted). The Court found that to be a "straightforward question" because "[i]n ordinary speech, no one would say that a person 'arrives *in*' a place—for example, . . . a country—before the person enters that place." *Id.*

When used in conjunction with a "geographic location" like the United States, "everyday speech" uses the word "in" as a "preposition . . . mean[ing] '[w]ithin the limits, bounds, or area of.'" *Id.* at 8 (quoting *In*, *American Heritage Dictionary* 910 (def. 1.a) (3d ed. 1992)). So being "in a destination"—i.e., the United States—means being "within its area . . . ." *Id.* The Court noted that "[e]veryday examples confirm that understanding": a running back is not *in* the end zone when he is on the one-yard line, and an invading army is not *in* a city when it is encamped outside the city's walls. *Id.*

To summarize, in the Supreme Court's most recent examinations of similar language to that found in Title IX, it found that being "in the United States" referred to physical presence in United States territory. *Id.*

The usage of the phrase "person in the United States" in other statutes is also consistent with this interpretation. The phrase is commonly used in import and export statutes. *See, e.g.*, 21 U.S.C. § 144 ("It shall be unlawful for any person in the United States to receive milk or cream imported into the United States unless the importation is in accordance with the provisions of this subchapter."); 19 U.S.C. § 1321(a)(2) (granting the Treasury Secretary the power to "admit articles free of duty and of any tax imposed on or by reason of importation" so long as the value of certain articles is less than an amount specified by the Secretary, which cannot be less than "$100 in the case of articles sent as bona fide gifts from persons in foreign countries to persons in the United States"). In those statutes, it is clear that "in the United States" means "within the physical territory of the United States." One such provision defines "export," for purposes of wartime export controls, as "the release or transfer of technology . . . to a foreign person in the United States." 50 U.S.C. § 4801(3)(B). This is particularly instructive because the modifier *foreign* implies that citizenship is distinct from whether someone is a person in the United States. If "person in the United States" referred to citizenship, a foreigner could never be a person in the United States, and "foreign person in the United States" would be oxymoronic.

The phrase also appears in statutes concerning national security. *See, e.g.*, 50 U.S.C. § 3506(a)(4)(D)(iii) (granting authority to certain CIA personnel to carry firearms "within the United States" to protect "defectors and their immediate families, and other persons in the United States under Agency auspices"). Take the statute aimed at frustrating Iranian missile exports,

which defines "United States person" to mean: "(A) a United States citizen; (B) a permanent resident alien of the United States; (C) an entity organized under the laws of the United States or of any jurisdiction within the United States, including a foreign branch of such an entity; or (D) a person in the United States." 22 U.S.C. § 9424(4). Although this statute was passed long after Title IX or its amendments, it shows that Congress can and will distinguish "United States citizen" from "person in the United States" when both citizenship and geography are relevant.

The final statute we will look at regards certain oaths and acknowledgments required in copyright disputes. Those oaths can be made "(A) before any person in the United States authorized by law to administer oaths; or (B) when made in a foreign country, before any diplomatic or consular officer . . . , or before any official authorized to administer oaths in the foreign country concerned . . . ." 17 U.S.C. § 1312(a)(1). Here, the contrast between (A), which concerns oaths taken "before any person in the United States," and (B), which concerns oaths "made in a foreign country," makes it clear that "person in the United States" is being used to refer to someone within United States territory.

Granted, these statutes are not related to Title IX such that the *in pari materia* canon applies, *see Erlenbaugh v. United States*, 409 U.S. 239, 243–44 (1972), but they provide strong evidence that the ordinary meaning of "person in the United States" is a "person physically located within the territory of the United States." They also demonstrate that Congress distinguishes between citizenship and geographical location when constructing statutes and that "person in the United States" refers to the latter. Absent reason to think that "person in the United States" has some other meaning in a civil rights statute like Title IX, plain-language analysis supports Defendants' position.

In fact, the nature of Title IX counsels in favor of the plain-language interpretation. Title IX was passed pursuant to the Spending Clause. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). The Spending Clause does not permit Congress to directly regulate conduct; instead, it enables Congress to distribute funds. *Landor v. La. Dep't of Corrs. & Pub. Safety*, 609 U.S. ___ (2026) (slip op. at 6). Congress can, however, use the Spending Clause to pursue its priorities by "attach[ing] conditions to the funds it distributes." *Id.* Spending Clause legislation like Title IX therefore creates a sort of contract where States receive

federal funds in return for complying with federally imposed conditions. *Id.* at 6–7. Because knowing acceptance of a putative contract requires awareness of its terms, we "insist[] that Congress speak with a clear voice" when passing Spending Clause legislation so that a State is aware of the conditions it accedes to when it accepts federal funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *Landor*, slip op. at 7 ("Congress must clearly and unambiguously alert a grant recipient to any condition on federal funds."). Federalism demands a "clear-statement rule when construing spending legislation as a matter of statutory interpretation" because "Congress can cajole the states to enact policies indirectly (through a spending inducement) that it could never directly order them to perform with its other enumerated powers . . . ." *Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022) (emphasis omitted). Under this canon, our question here is simple: "Would a prospective funding recipient, at the time it engaged in the process of deciding whether to accept federal dollars, have been aware that it would face" liability for how it treated a person who resided outside of the United States? *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 220 (2022) (cleaned up).

The answer is no. The clear-statement inquiry always begins with the text. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). "Nothing in Title IX clearly and unambiguously alerts funding recipients" that they would face liability for discriminating against persons outside of the United States; rather, the plain language of the statute suggests the opposite. *West Virginia v. B.P.J. ex rel. Jackson*, 146 S. Ct. 2356, 2383 (2026) (Gorsuch, J., concurring). Generally, a statute cannot provide a clear statement that goes against its plain language. *See Arlington Cent. Sch. Dist. Bd. of Educ.*, 548 U.S. at 296. In fact, "clear statement" and "plain language" are something close to synonyms. *Cf. Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 653 (2026) (Gorsuch, J., concurring) (describing the requirement that statutory power "be conferred in plain language" as a clear statement rule (quoting *Siler v. Louisville & Nashville R.R. Co.*, 213 U.S. 175, 194 (1909))). It is questionable whether a State receiving federal funds would be aware that it might be on the hook for *any* employment-discrimination suits under Title IX, let alone those brought by foreign residents. *See Joseph v. Bd. of Regents of the Univ. Sys. of Ga.*, 121 F.4th 855, 864 (11th Cir. 2024), *cert. granted sub nom.*, *Crowther v. Bd. of Regents of the Univ. Sys. of Ga.*, No. 25-183, 2026 WL 1377024 (U.S. May 18, 2026). But it is certain that a prospective funding recipient reading a statute that

prohibits discrimination against persons *in* the United States would not expect to face liability for discriminating against persons *outside of* the United States. The consistent usage of the phrase by other statutes, explained above, also supports this application of the clear-statement canon. *See Arlington Cent. Sch. Dist. Bd. of Educ.*, 548 U.S. at 300–02.

As the district court noted, however, the Supreme Court has suggested that in rare cases we can look past the plain, unambiguous language of the statute when the language leads to an absurd result. *See Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 253 (6th Cir. 2020). An absurd result is one Congress could not possibly have intended; the absurdity must be "so clear as to be obvious to most anyone." *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 470–71 (1989) (Kennedy, J., concurring in the judgment). "[A]voidance of unhappy consequences" is insufficient justification for invoking the absurdity canon. *Nixon v. Mo. Mun. League*, 541 U.S. 125, 141 (2004) (Scalia, J., concurring in the judgment).

The district court, for its part, considered it absurd that Title IX's protections could be "turned on and off based on nothing more than where a plaintiff happens to be located at any given moment . . . ." R. 55, Dist. Ct. Order, PageID 1734. This is encapsulated in a hypothetical: suppose a plaintiff lived in the United States, but traveled abroad for a single day, and during that single day the discriminatory decision was made. Under Defendants' interpretation, that plaintiff may be unprotected by Title IX. The district court thought that such a loophole would undermine the purpose of the statute.

We disagree because the truly absurd result likely would never obtain. The district court's day-traveler hypothetical raises a concerning possibility: that educational institutions could deliberately send their employees abroad and subject them to a discriminatory adverse employment action as soon as they disembark, thus avoiding Title IX liability. But the district court's relevant inflection point—the time "when a discriminatory decision was made"— eliminates this concern. *Id.* If sending an employee abroad was part of a discriminatory firing

scheme, the decision to fire him likely would have been made at the time the conspiracy was hatched, at which point he was presumably stateside.[3]

What is more, the district court's interpretation—that the phrase refers to "the location of the conduct rather than the precise location of the plaintiff"—would produce even more absurd results. *Id.* Imagine a Chinese national living in China. She has never left China but would like to work at an American university. So she applies online to an open position at Miskatonic University in Arkham, Massachusetts.[4] Miskatonic has lost many male professors to unexplained disappearances, insane asylums, and sundry supernatural horrors. It would thus prefer to hire a man to fix the resulting gender imbalance in its Eldritch Studies Department. Miskatonic's hiring committee dismisses the Chinese national's application out of hand for no other reason than that she is female. She does not, at any time, visit America. She does not get a virtual interview. She does not even get an email from Miskatonic informing her that her application has been rejected.

Clearly, the Chinese national has been discriminated against on the basis of her gender. Under the district court's interpretation, she would have a slam-dunk Title IX discrimination suit. That cannot be right, because it would mean that anyone in the entire world could bring a Title IX claim so long as the position he or she was applying for was in the United States. That would go against the plain language of Title IX, and no recipient of federal funds would understand themselves to be open to liability from anyone, anywhere on the planet.

In support of its interpretation, the district court points to Supreme Court dicta suggesting that Title IX was intended to protect citizens regardless of location. In *Cannon v. University of Chicago*, the Supreme Court reasoned that Congress enacted Title IX "to provide individual citizens effective protection against [discriminatory] practices." 441 U.S. 677, 704 (1979).

---

[3]This analysis raises another difficult question: at what point do we determine physical location for purposes of Title IX protection? Is it when the plaintiff finds out that he has been fired? Is it when the administrator privately decides to fire him? We need not resolve this issue because Charlton-Perkins was abroad when Petren made the decision to cancel the job search, when Petren announced the cancellation, and when Charlton-Perkins learned that the job search was cancelled. In other words, no matter where one wishes to draw the line, Charlton-Perkins was not a "person in the United States."

[4]*See* H. P. Lovecraft, *The Shadow over Innsmouth*, The H. P. Lovecraft Archive, https://hplovecraft.com/writings/texts/fiction/soi.aspx (Aug. 20, 2009).

Several problems arise from relying on this language.  One, dicta is not binding.  *Wright v. Spaulding*, 939 F.3d 695, 700–01 (6th Cir. 2019); *see Olivier v. City of Brandon*, 607 U.S. 552, 565 (2026).  Two, although *Cannon*'s private-right-of-action holding was later ratified by statute, its underlying reasoning has been disclaimed by the Court.  *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 369 n.1 (2025).  Three, the language itself raises the question of whether the Court was referring to all citizens or only those residing within America's borders.  In sum, *Cannon*'s dicta is too thin a reed on which to rest an argument.

At oral argument, Charlton-Perkins suggested that he could be a "person in the United States" under any number of theories: his citizenship, his physical presence in the United States during the interview process, and the fact that the job would be in the United States.  The location of the job does not help him for the reasons stated above.  His presence in the United States during the interview process cannot be enough either.  The statute states that "no person in the United States shall, on the basis of sex, be . . . subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  That language strongly suggests that the presence in the United States must be linked to being "subjected to discrimination."  And he was not subjected to any gender discrimination at the time of the in-person interview.

Further, Charlton-Perkins's reference to his citizenship suggests that he would like us to define the relevant phrase to refer to both physical location *and* citizenship.  We decline.  To define "person in the United States" as "anyone physically located in the United States, *and* citizens of the United States located abroad" would twist statutory language far beyond its ordinary meaning.  That Congress would use "in" to simultaneously refer to physical presence in the United States, regardless of citizenship, *and* United States citizenship, despite physical presence outside of the United States, beggars belief.  This is especially true considering other statutes in which Congress addresses citizenship and physical location separately when both considerations are relevant.  *See, e.g.*, 22 U.S.C. § 9424(4); 17 U.S.C. § 1312(a)(1).

For these reasons, therefore, we conclude that the district court properly granted summary judgment to the University on the Title IX claim.[5]

## IV.

Charlton-Perkins also challenges the district court's dismissal of his official-capacity equal-protection claims.  As discussed below, we hold that sovereign immunity bars these claims because (1) instatement is an impermissible burden on the state treasury, and (2) a suit in equity for an instatement injunction is too far removed from the suits in equity that could have been brought against a State at the Founding.

**A.      Charlton-Perkins's Requested Injunction Impermissibly Burdens the State Treasury**

Unless waived or abrogated, Eleventh Amendment sovereign immunity deprives the court of subject-matter jurisdiction when an individual sues a State.  *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015); *Ladd v. Marchbanks*, 971 F.3d 574, 577 n.2 (6th Cir. 2020).  "However, under the *Ex parte Young* exception, 'a federal court may, without violating the Eleventh Amendment, issue a prospective injunction against a state officer to end a continuing violation of federal law.'"  *Doe v. DeWine*, 910 F.3d 842, 848 (6th Cir. 2018) (quoting *Price v. Medicaid Dir.*, 838 F.3d 739, 746–47 (6th Cir. 2016)).

---

[5]For similar reasons, Charlton-Perkins's presence in England at the time of the alleged discriminatory conduct may also impact his equal-protection claims.  The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. am. XIV, § 1.  The Supreme Court has clarified that this "guarantee" extends to all persons "within a State's boundaries, and to all upon whom the State would impose the obligations of its laws."  *Plyler v. Doe*, 457 U.S. 202, 214 (1982).  As explained above, Charlton-Perkins was not within Ohio's boundaries when the alleged discriminatory acts occurred.  And it is not obvious that applying to work for the State of Ohio otherwise "subject[ed]" Charlton-Perkins to "obligations imposed by the State's civil and criminal laws."  *Id.* at 215.  Further cause for concern is the Supreme Court's recent construction of another clause in the same section of the Fourteenth Amendment.  The Court found that a phrase in the Citizenship Clause, "subject to the jurisdiction thereof," U.S. Const. am. XIV, § 1, "uses jurisdiction in its ordinary sense—referring to the power of the United States to govern those *within its territory*."  *Trump v. Barbara*, 609 U.S. ___ (2026) (slip op. at 11) (emphasis added).  Taken together, *Plyer* and *Barbara* cast doubt on whether any person who was outside of a State's borders when an alleged equal-protection violation by that State occurred could maintain an equal-protection claim against that State when the State has not affirmatively imposed the obligations of its laws on that person.  But we decline to reach this issue because (1) it was not raised nor briefed by the parties and (2) it would not control the outcome of the equal-protection claims for the reasons discussed in Sections IV and V.

Generally, "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). However, a suit in equity to end a continuing violation of federal law is not barred when the requested injunction would have "only an incidental or ancillary effect on a state's treasury." *Turker v. Ohio Dep't of Rehab. and Corr.*, 157 F.3d 453, 459 (6th Cir. 1998). This "ancillary-effect exception" is "narrow . . . ." *Ernst v. Rising*, 427 F.3d 351, 368 (6th Cir. 2005) (en banc) (cleaned up). "While an injunction order may have an 'ancillary' effect on the state treasury, it may not directly require payments from the state treasury." *Id.* at 370. Ultimately, "[t]he dividing line" between permissible and impermissible relief is whether the burden on the public treasury "is the primary thrust of the suit." *Barton v. Summers*, 293 F.3d 944, 949 (6th Cir. 2002).

To that end, we have held that expunging workplace disciplinary records is permissible relief because a state university, in complying with the injunction, "would incur expenses that are, at most, minimal and ancillary to [the] main goals of" preventing future employment consequences due to the negative entries on the plaintiff's record. *Ashford v. Univ. of Mich.*, 89 F.4th 960, 969–70 (6th Cir. 2024) (cleaned up). But when certain state-court judges sought an injunction requiring Michigan to equalize their retirement benefits with other, more handsomely compensated state-court judges, we denied that relief as a direct burden on the public fisc. *Ernst*, 427 F.3d at 372. We did so because the thrust of the requested injunction was to force the State to internally reallocate dollars. *Id.* at 370–71. That meant the remedy would "directly require payments from the state treasury." *Id.* at 370.

We have previously held that a request for reinstatement to a prior employment position is an appropriate *Ex parte Young* action because it has only ancillary treasury effect. *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013). We have not held the same as it relates to instatement.

Instatement actions cannot exploit the *Ex parte Young* exception because they are a form of relief materially different in kind from reinstatement. Charlton-Perkins is asking us to force the State of Ohio to create and fund, via the public treasury, a position that does not currently exist. The effect on the state treasury of an instatement remedy therefore cannot be characterized

as the same as that of reinstatement. The latter has no marginal impact on state funds, given that reinstatement presupposes a job already created by the State. But instatement requires creation of a new position with commensurate new public spending to fund it.

We have implicitly recognized that in the typical reinstatement case the position sought already exists. *Cf. Alexander v. Bosch Auto Sys., Inc.*, 232 F. App'x 491, 497 (6th Cir. 2007) (ERISA reinstatement remedy unavailable if position no longer exists). So the action compelled by a reinstatement injunction is that the named defendant officer allow the plaintiff simply to resume his duties. Since those duties are to be performed in a job already created by the State, the costs associated with complying with the injunction have only "an ancillary effect on the state treasury." *Edelman*, 415 U.S. at 668.

Such is not the case with instatement. Here, the State would have to establish and fully fund a new position for Charlton-Perkins. The costs are not deemed "ancillary" because they have never been incurred by the State before. This is not a situation where Charlton-Perkins wants the State to take some action with negligible cost, like expunging a disciplinary record, to avoid *future* discrimination. *See Ashford*, 89 F.4th at 969–70. He wants the State to remedy its *past* discriminatory decision. And he wants it to do so by "reallocati[ng] . . . 'dollars'" from somewhere else in its budget to fund a new assistant professorship. *Ernst*, 427 F.3d at 370 (citation omitted). His requested injunction is therefore more like the one in *Ernst*: commanding "direct[] . . . payments from the state treasury," *id.*, "is the primary thrust of the suit," *Barton*, 293 F.3d at 949. Moreover, we have no reason to believe that the named defendant officers themselves would have the authority to create the new position without the approval of the State of Ohio. *See* Ohio Rev. Code § 3361.03. So the State is the entity that would effectively be charged with affirmative duties were we to award Charlton-Perkins his injunction.

In this situation, the public expenditure is hardly a sideshow to the injunctive relief. It is the main event. We therefore find that the instatement remedy infringes on the State's authority through its direct impact on the public treasury.

**B.      Charlton-Perkins's Requested Injunction is Inconsistent with History and Tradition**

History and tradition further counsel against extension of our reinstatement jurisprudence to instatement actions.  Immunity from private suit is an essential feature of state sovereignty. *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 238 (2019).  So a broad conception of state sovereign immunity, developed in the common law and the law of nations, was incorporated into—or, at least, left untouched by—the Constitution.  *Id.*; William Baude & Stephen E. Sachs, *The Misunderstood Eleventh Amendment*, 169 U. Pa. L. Rev. 609, 615–17 (2021).  Unless abrogated, sovereign immunity protects a State from a suit "anomalous and unheard of when the [C]onstitution was adopted."  *Hans v. Louisiana*, 134 U.S. 1, 18 (1890).  The equitable powers of federal courts are limited to those "traditionally accorded" by the English High Court of Chancery at the enactment of the Judiciary Act of 1789.  *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).  Also, *Ex parte Young* does not permit courts to "devise novel remedies that have no background in traditional equitable practice."  *Trump v. CASA*, 606 U.S. 831, 846 n.9 (2025).  We therefore must consider whether the present suit is sufficiently analogous to one that could be brought against a State at the Founding.

If we limit our historical inquiry to equitable relief available in the English Court of Chancery circa 1789, Charlton-Perkins is out of luck.  Chancery practice at the time of the Founding was confined to private law and would not grant injunctions against a State to protect public rights.  Owen Gallogly, *Equity's Constitutional Source*, 123 Yale L.J. 1213, 1315 (2023).  Perhaps that settles it.  "[T]he distinction between common law and equity, as existing in England" at the Founding "has been maintained" in our Constitution.  *In re Sawyer*, 124 U.S. 200, 209–10 (1888).  So, because Charlton-Perkins's requested instatement injunction is a public-law suit in equity against a State, it would have been "anomalous and unheard of when the [C]onstitution was adopted."  *Hans*, 134 U.S. at 18.

Yet that cannot be the end of our inquiry, because our modern courts regularly grant injunctions in public-law cases, and typically do so by invoking *Ex parte Young*.  *See* James Pfander & Wade Formo, *The Past and Future of Equitable Remedies*, 71 Ala. L. Rev. 723, 748 (2020) ("[T]he *Ex parte Young* action serves as the primary mode by which individuals vindicate their constitutional rights in litigation with the federal government.").  We are thus bound by

precedents that have expanded the class of suits available against a State beyond those a federal court could have entertained at the Founding. *See infra* p. 19–20. To determine whether those precedents benefit Charlton-Perkins in his request for a novel application of *Ex parte Young*, we must consider the extent to which our *Ex parte Young* jurisprudence is analogous to Founding-era equity practice and whether the present case is similarly analogous. That means we need to look closer at *Ex parte Young* itself.

*Ex parte Young* involved a Minnesota commission restricting railroad rates. 209 U.S. 123, 127 (1908). Certain railroad company stockholders brought suits in equity against, among others, Young in his official capacity as Minnesota Attorney General. *Id.* at 129. The district court issued an injunction forbidding Young from enforcing Minnesota's rate laws. *Id.* at 132. Young chose to violate the injunction and then file writs of habeas corpus and certiorari with the Supreme Court challenging the subsequent contempt order. *Id*. at 126, 134. The Court sided with the shareholders on the merits, finding the rate laws unconstitutional. *Id.* at 148. And it held that the underlying suit against Young was not barred by sovereign immunity. *Id*. at 150–56.

*Ex parte Young* presents two difficult questions. *First*, how could a suit be maintained against Young, an individual, for violating the Fourteenth Amendment, which regulates only State conduct? *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 114 n.25 (1984). *Second*, no federal statute was cited as the source of the right asserted or remedy sought by the shareholders, so what was the source of remedial authority in *Ex parte Young*? *See Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 498–99 (5th Cir. 2020) (Oldham, J., concurring); David L. Shapiro, Ex parte Young *and the Uses of History*, 67 N.Y.U. Ann. Surv. Am. L. 69, 74–75 (2011).

The simplest way to resolve both questions is to consider the shareholder action in *Ex parte Young*, insofar as it was brought against Young, as analogous to a bill in equity for an antisuit injunction—a well-established form of equitable relief. John Harrison, Ex parte Young, 60 Stan. L. Rev. 989, 997–1001 (2008); *see also Va. Office for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring) (recognizing that the "negative injunction" in *Ex parte Young* "was nothing more than the pre-emptive assertion in equity of a defense that would

otherwise have been available in the State's enforcement proceedings at law"). With the case framed this way, the constitutional defenses to enforcement of the Minnesota act could be litigated without impinging on Minnesota's sovereign immunity, precisely because they were *defenses*, not affirmative claims on the State of Minnesota. Harrison, *supra*, at 1000. Just as a State cannot invoke sovereign immunity when it affirmatively avails itself of a federal court, *see Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 623–24 (2002), it cannot invoke sovereign immunity to avoid the litigation of an affirmative defense in certain pre-enforcement actions. That makes *Ex parte Young* a fairly easy sovereign immunity case. *See id.*; Harrison, *supra*, at 1000. As to the cause of action, *Ex parte Young*'s innovation finds its footing in traditional equity practice: "instead of asserting that a private defendant's suit at law should be enjoined based on fraud or undue influence, the [*Ex parte Young*] plaintiff asserts that a government enforcement action should be enjoined based on a different type of unlawfulness, namely the unconstitutionality of the underlying statute." Gallogly, *supra*, at 1315.

Some have criticized this interpretation of *Ex parte Young* as inconsistent with historical equity practice because "[e]ighteenth-century English courts would not grant an injunction against the sovereign" and "criminal prosecutions could not be enjoined." Andrew Oldham et al., *The* Ex parte Young *Cause of Action*, 120 Nw. U. L. Rev. 1697, 1712 (2026); *see also* James E. Pfander & Jacob P. Wentzel, *The Common Law Origins of* Ex parte Young, 72 Stan. L. Rev. 1269, 1339–40 (2020). Indeed, in the years prior to *Ex parte Young*, the Supreme Court stated that "to sustain a bill in equity to restrain or relieve against proceedings for the punishment of offenses . . . is to invade the domain of the courts of common law . . . ." *Sawyer*, 124 U.S. at 210; *see also* 2 Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* § 893 (13th ed. 1886) ("Courts of Equity . . . will not interfere to stay proceedings in any criminal matters . . . .").

That criticism may well be correct: *Ex parte Young* expanded federal courts' equitable powers. However, our inquiry is analogical, not strictly historical, so some flexibility is justified. *See CASA*, 606 U.S. at 841–42. Other types of suits to compel the action or inaction of government officials were widely available at the Founding. Gallogly, *supra*, at 1316 (discussing the prerogative writs); Pfander & Wentzel, *supra*, at 1277–79 (same). Antisuit

injunctions were available at the Founding.  *See CASA*, 606 U.S. at 846 n.9; Harrison, *supra*, at 997–99.  *Ex parte Young* did something novel by combining these two premises to extend the availability of an antisuit injunction to anticipated criminal enforcement.[6]  *See Younger v. Harris*, 401 U.S. 37, 45 (1971); Gallogly, *supra*, at 1315–16; Shapiro, *supra*, at 84–85.

Importantly, the antisuit analogy is how the Court has described its own case: "Historically, a court of equity could issue an antisuit injunction to prevent an officer from engaging in tortious conduct.  *Ex parte Young* justifies its holding by reference to a long line of cases authorizing suits against state officials in certain circumstances."  *CASA*, 606 U.S. at 846 n.9.  Although the Court stopped short of holding that grounding *Ex parte Young* in the antisuit injunction is historically appropriate, it provided a binding account of what the Court in *Ex parte Young* understood *itself* to be doing.  *See id.*; *see also Va. Office for Prot. & Advoc.*, 563 U.S. at 262 (Kennedy, J., concurring) (endorsing the antisuit-injunction interpretation outright).

Application of *Ex parte Young* in the years following the decision supports this account.  For the decades after it was decided, *Ex parte Young* "stood for the proposition that sovereign immunity did not bar lawsuits . . . in which a potential defendant in an enforcement action sought an injunction against that action," rather than "the proposition that officer suits could be used to obtain prospective injunctive relief in general" or "affirmative relief from a State."  Harrison, *supra*, at 1008; *see, e.g.*, *Hopkins v. Clemson Agric. Coll.*, 221 U.S. 636, 642 (1911) ("No suit . . . can be maintained against a public officer, which seeks to compel him to . . . do any affirmative act which affects the State's political or property rights."); *Ga. R.R. & Banking Co. v. Redwine*, 342 U.S. 299, 304–05 & n.15 (1952) (allowing injunction against future tax collection but not specific performance); *see also Younger*, 401 U.S. at 45 (*Ex parte Young* "established the

---

[6]One could ask how *Ex parte Young* could be justified by reference to injunctions *and* writs available at the Founding; after all, the Founding was in the era of the divided bench, *Sawyer*, 124 U.S. at 209–10, and the prerogative writs were actions at law, Oldham, *supra*, at 1703.  That question slightly misses the mark.  Although the English legal system heard cases at common law and in equity in separate courts, the two bodies of law were hardly independent.  Rather, equity was a supplement to the common law developed to fill remedial gaps.  Pfander & Wentzel, *supra*, at 1276; Gallogly, *supra*, at 1231–41 (tracing the development of equity in response to an ossifying common law).  Regardless, our inquiry seeks to find the closest historical analogue possible for a suit against a State blessed by the Supreme Court and then asks if such an analogy would extend to the case at hand.  It is not the job of a circuit court to resolve whatever anachronisms may exist in *Ex parte Young* or its progeny.

doctrine that, when absolutely necessary for protection of constitutional rights, [federal courts] have [the] power to enjoin state officers from instituting criminal actions.").

Charlton-Perkins's suit cannot benefit from *Ex parte Young*'s novel application of the antisuit injunction to a pre-enforcement action against a State. Indeed, Charlton-Perkins is not seeking an antisuit injunction or any other form of pre-enforcement relief. The constitutional harm he alleges—being denied the assistant professor position because of his gender—happened in the past. There is no future action to enjoin.

So *Ex parte Young* itself does not enable Charlton-Perkins to avoid sovereign immunity. But what about the reinstatement suits already blessed by this circuit? *See Diaz*, 703 F.3d at 964. Surely, they cannot rest on the same analogy to antisuit injunctions, and public-law suits in equity against a State were unavailable at the Founding. *See* Gallogly, *supra*, at 1315. So, in order to find the closest historical analogue possible, we need to look to the other actions the Founders would have imported from English law. We will then consider whether the logic behind that analogy supports the novel extension of *Ex parte Young* requested by Charlton-Perkins.

Various actions at law bearing "significant resemblance to injunctions" were available at the time of the Founding to "correct the unlawful administration of government." Pfander & Wentzel, *supra*, at 1276–79. "At the Founding, public-law plaintiffs typically *did* have adequate avenues for redress outside of Chancery, namely the prerogative writs of certiorari, mandamus, and prohibition." Gallogly, *supra*, at 1316. The writ of certiorari quashed unlawful administrative orders, the writ of mandamus compelled a government official to perform his administrative duties, and the writ of prohibition kept non-common law bodies from proceeding "where they ought not." Pfander & Wentzel, *supra*, at 1297–99 (citation omitted).

The writ of mandamus deserves a closer look. Before the Founding, mandamus developed into a broadly available remedy to compel performance of wrongfully refused duties of governmental office. 3 William Blackstone, *Commentaries* *110. And the very first historical use of mandamus looks somewhat like reinstatement.

Sir Edward Coke, then Lord Chief Justice of the King's Bench, created mandamus "out of whole cloth," Pfander & Wentzel, *supra*, at 1297 (citation omitted), in *James Bagg's Case* (1615) 77 Eng. Rep. 1271. Bagg was a resident of Plymouth, England. *Id.* at 1274. Over time, he developed a habit of disrespecting the town's mayor. He called one mayor "a cozening knave"; another, an "insolent fellow." *Id.* Worst of all, he "turn[ed] the hinder part of his body in an inhuman and uncivil manner towards" the second mayor, and "scoffingly, contemptuously, and uncivilly, with a loud voice," told the mayor to "[c]ome and kiss." *Id.* at 1275 (cleaned up). For these misdeeds, the mayor and city council kicked him out of Plymouth. *Id.* at 1271. Gadfly that he was, he did not accept his ejection and instead requested "a writ to restore the party" from the King's Bench. *Id.* at 1272. Lord Chief Justice Coke held that Bagg could not be so disenfranchised without authority conferred by the town's charter or by criminal conviction. *Id.* at 1279. Bagg was ordered restored "to his franchise and freedom . . . ." *Id.* at 1281.

Squinting with modern eyes, that looks a bit like a reinstatement action. After all, Bagg had been removed from his "'office' of 'freeman,'" Pfander & Wentzel, *supra*, at 1297 (citation omitted), and the King's Bench ordered him reinstated, *Bagg's Case*, 77 Eng. Rep. at 1281. Likewise, in successful reinstatement actions, a plaintiff is ejected from his *office* of *employee*, and a court orders him "restore[d]" to that office. *Id.*; *see, e.g.*, *Diaz*, 703 F.3d at 964. But even to the extent this analogy is appropriate for reinstatement actions, it cannot rescue instatement actions.[7] That is because the duties traditionally compelled by mandamus were nondiscretionary. Pfander & Wentzel, *supra*, at 1301. Hiring is generally a discretionary function. *See O'Bryan v. Holy See*, 556 F.3d 361, 384 (6th Cir. 2009). It was certainly a

---

[7]To be clear, suits in equity for reinstatement would not have been available against a State at the Founding. *See* Gallogly, *supra*, at 1315. While it is true that courts could issue *preliminary* equitable relief ordering reinstatement during the pendency of litigation, "a court of equity would not and could not finally determine whether a plaintiff was validly removed" from office, because "that was a question only a court of law could settle . . . ." *Trump v. Cook*, 609 U.S. ___ (2026) (slip op. at 15). In other words, a court in equity could not issue a *permanent* injunction ordering reinstatement. *See id.* at 16 ("'[A] court of equity has no jurisdiction over the appointment and removal of public officers,' for such jurisdiction 'belongs exclusively to the courts of law.'" (quoting *Sawyer*, 124 U.S. at 212)). It is also true that the prerogative writs are an imperfect analogy given that (1) they were creatures of law, not equity, Oldham, *supra*, at 1703, and (2) they were issued in the King's name from the King's Bench—in other words, the Crown (analogous to a State for our purposes) had already consented to suit by virtue of exercising jurisdiction over the application for the writ, Blackstone, *supra*, at *110. But these criticisms are academic because we do not write on a blank slate. Instead, we try to find the historical analogue of best fit for the reinstatement remedy endorsed by this circuit and ask whether the instatement remedy fits likewise.

discretionary function here, where Petren had discretionary authority over whether the University would hire *anyone*, let alone Charlton-Perkins. So an analogy to mandamus would be inapt, and exercising jurisdiction over Charlton-Perkins's official-capacity equal-protection claim would subject the State of Ohio to a suit "anomalous and unheard of when the [C]onstitution was adopted." *Hans*, 134 U.S. at 18.

To summarize, the reinstatement remedy recognized by this circuit as sometimes appropriate for suits against States has an arguable basis in actions available against States at the Founding. An instatement remedy has far less sure footing.

We therefore affirm the district court's dismissal of Charlton-Perkins's official-capacity equal-protection claims as barred by the Eleventh Amendment.

**V.**

Finally, Charlton-Perkins appeals the district court's grant of qualified immunity to Petren and Uetz on the individual-capacity equal-protection claims. Qualified immunity provides government officials immunity from suits for civil damages when their conduct does not violate clearly established statutory or constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The plaintiff has the burden of showing that (1) the facts alleged make out a violation of a constitutional right and (2) the right at issue was clearly established at the time of the alleged misconduct. *Sexton v. Cernuto*, 18 F.4th 177, 184 (6th Cir. 2021). "In determining whether a right was clearly established, we look first to decisions of the Supreme Court, then to our own precedents, and then to decisions of other courts of appeal, and we ask whether these precedents placed the constitutional question beyond debate." *Wright v. City of Euclid*, 962 F.3d 852, 869 (6th Cir. 2020) (quoting *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013)) (cleaned up).

Petren and Uetz are entitled to qualified immunity because Charlton-Perkins has not carried his burden of providing caselaw clearly establishing the constitutional right at issue. *See Sexton*, 18 F.4th at 184. In fact, he has not even tried to provide on-point caselaw. Instead, he argues that this is "the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."

*District of Columbia v. Wesby*, 583 U.S. 48, 64 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). The cases he cites for this "obviousness" exception do him no favors. He relies principally on *Williams v. Maurer*, which did not discuss obviousness. 9 F.4th 416, 437–38 (6th Cir. 2021). There, we held that the conduct at issue violated law that was clearly established by a prior panel. *Id.* (citing *Barton v. Martin*, 949 F.3d 938, 949 (6th Cir. 2020)). The other case he cites, *Moderwell v. Cuyahoga County*, is not an obviousness case either. 997 F.3d 653, 665 (6th Cir. 2021) (finding the law at issue clearly established).

Charlton-Perkins's obviousness argument relies primarily on the record. He points to the evidence establishing that Petren and Uetz were concerned about the potential legal consequences for their actions. At the outset, it is unclear why Petren and Uetz's subjective knowledge of potential illegality matters. The clearly established prong of qualified immunity asks not what the officer in question knew about the law, but rather whether "a reasonable officer" would know that "his conduct was unlawful in the situation he confronted." *Wesby*, 583 U.S. at 63 (citation omitted). That is an objective, not subjective, test. But even under the framework Charlton-Perkins proposes, the evidence does not indicate obviousness. If anything, the record suggests that Petren thought cancelling the search would be a way to *avoid* liability. That would suggest that Petren thought cancelling the search would *not* violate Charlton-Perkins's constitutional rights.

Using the correct objective test does not help Charlton-Perkins either. Obviousness is a high bar to clear. The Supreme Court found an Eighth Amendment violation obvious when a prisoner was chained to a hitching post in the hot sun for seven hours and deprived of water and bathroom breaks, *Hope v. Pelzer*, 536 U.S. 730, 738 (2002), and when a prisoner was confined in cells overflowing with human waste for six days, *Taylor v. Riojas*, 592 U.S. 7, 7–9 (2020) (per curiam). Similarly, we have found constitutional violations obvious when an officer "fabricat[ed] evidence to convict three innocent men of a capital offense," *Jackson v. City of Cleveland*, 925 F.3d 793, 825 (6th Cir. 2019), and when an officer "discharg[ed] enough pepper spray in a detainee's face to cause him to lose consciousness," *Grawrey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009). The "facts of [those] cases far outstrip what" Charlton-Perkins "suffered

here." *DeLanis v. Metro. Gov't of Nashville & Davison Cnty.*, 160 F.4th 732, 745 (6th Cir. 2025).

Given the lack of law on the point, a reasonable administrator could conclude that he would not violate any applicant's rights if he simply declined to hire anyone at all. That is especially true considering the uniqueness of the situation and the consternation surrounding the job search. The department was up in arms about the alleged conflict of interest. And the person accusing Petren and Uetz of gender discrimination during the hiring process was the very individual implicated in the conflict-of-interest issue. Further, Petren expressed concern that continuing with the hiring process could result in unlawful discrimination against Charlton-Perkins *or* the female candidates. In such a scenario, given the absence of on-point authority directing otherwise, it was not unreasonable for an administrator to think it legal to cure the taint of discrimination by calling the whole thing off. Regardless of the wisdom of the decision to cancel the search, it was not so obviously unconstitutional that qualified immunity should be denied.

We therefore affirm the district court's dismissal of the personal-capacity equal-protection claims.

**VI.**

We **AFFIRM**.

---

**CONCURRENCE**

---

MURPHY, Circuit Judge, concurring.  Mark Charlton-Perkins brought statutory claims against the University of Cincinnati under Title IX and equal-protection claims against two university officials under 42 U.S.C. § 1983.  Judge Bush's majority opinion explains well why these claims cannot survive the summary-judgment stage.  I write to flag an additional causation question that the parties have overlooked so that future parties do not make the same mistake.

Charlton-Perkins and the university defendants treat our precedent applying the federal employment laws as creating an interchangeable body of common-law rules.  They simply assume that the principles that we have incorporated into Title VII apply in full force to sex-discrimination claims under Title IX and equal-protection claims under § 1983.  But we are not a common-law court and have no power to adopt the employment rules that we think best as a policy matter.  *See Alexander v. Sandoval*, 532 U.S. 275, 287 (2001).  Rather, we must neutrally interpret the text enacted by Congress (in statutes) or the framers (in the Constitution).

And I see a noticeable difference between the text of Title VII and the texts of Title IX, § 1983, and the Equal Protection Clause.  Title VII prohibits an employer from taking an adverse action against an employee "because of" the employee's "race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).  Critically, though, it adds that an employee can show that an employment action arose from one of these five traits if the employee "demonstrates that race, color, religion, sex, or national origin was a *motivating factor* for" the action, "even though other factors also motivated" it.  *Id.* § 2000e-2(m) (emphasis added).  So a protected trait might qualify as a "motivating factor" when it played a role in the employer's subjective decisionmaking, even if the employer would have taken the same action for other reasons too.  If the employee satisfies this motivating-factor standard, Title VII then shifts the burden of persuasion to the employer to prove that it "would have taken the same action in the absence of the impermissible motivating factor[.]"  *Id.* § 2000e-5(g)(2)(B).  This affirmative defense, if successful, allows the employer to

avoid certain remedies (including compensatory damages and reinstatement).  *Id.*; *see Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 337 (2020).

The parties' briefing implies that Title VII's motivating-factor standard extends to claims under Title IX and § 1983.  I am not so sure.  Start with Title IX.  This title bars schools receiving federal funds from taking adverse actions "on the basis of sex": "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"  20 U.S.C. § 1681(a).  The ordinary meaning of "on the basis of"—like the ordinary meaning of "because of," "on account of," or "by reason of"—requires a plaintiff to show that sex was at least a but-for cause of the adverse action.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013) (citation omitted); *see Comcast*, 589 U.S. at 334; *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).  In other words, a plaintiff must prove that the adverse action would not have occurred "but for" the plaintiff's sex.  *Nassar*, 570 U.S. at 346–47.  If anything, Title IX makes but-for causation only the minimum standard.  Its "on the basis of" text may well require an individual's sex to be the "main constituent" or "fundamental ingredient" of the adverse action—not just a but-for cause of the action.  *Niblock v. Univ. of Ky.*, 165 F.4th 460, 469 (6th Cir. 2026) (Sutton, C.J., & Murphy, J., concurring) (quoting I *Oxford English Dictionary* 985 (2d ed. 1989)).

What is noticeably missing from Title IX?  The motivating-factor language that Congress added to Title VII.  We likely "cannot ignore" this omission under normal rules of statutory interpretation.  *Gross*, 557 U.S. at 174–75; *see Comcast*, 589 U.S. at 338.  Indeed, the Supreme Court has refused to read two other employment laws to adopt the "lessened" motivating-factor "standard" because Congress did not put that standard into those laws.  *Nassar*, 570 U.S. at 349.  For example, the Court has held that Congress's use of "because of" in the Age Discrimination in Employment Act (ADEA) requires plaintiffs to show that an employee's age was a but-for cause of the employer's adverse action.  *See Gross*, 557 U.S. at 175–79; 29 U.S.C. § 623(a)(1).  And it has held that Title VII's anti-retaliation provision (which uses similar "because" language) likewise requires plaintiffs to show that an employee's complaints of discrimination were the but-for cause of the employer's adverse action.  *See Nassar*, 570 U.S. at 352–60; 42

U.S.C. § 2000e-3(a). As the Fourth Circuit has explained, it would make little sense to use a motivating-factor test in Title IX when the Supreme Court has refused to extend that test to the ADEA or even to other parts of Title VII itself. *See Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236–37 (4th Cir. 2021). And we certainly should not take such a leap just because the parties fail to brief the relevant distinctions between these two "vastly different" laws. *West Virginia v. B.P.J. ex rel. Jackson*, 146 S. Ct. 2356, 2373 (2026) (citation omitted).

The parties also assume that Title VII's motivating-factor test applies to constitutional claims under § 1983. That assumption is equally dubious. Section 1983 makes "liable" a state actor who "subjects, or causes to be subjected," another person to a constitutional "deprivation":

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]

42 U.S.C. § 1983. Claims under this statute require courts to disentangle statutory questions (about the meaning of § 1983) from constitutional questions (about the meaning of the constitutional right at issue in a specific § 1983 case). *See Manuel v. Joliet*, 580 U.S. 357, 370 (2017); *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1159–60 (6th Cir. 2021).

Start with the relevant constitutional question: what must prospective public employees prove to show that they have suffered a "deprivation" of their "rights" under the Equal Protection Clause? 42 U.S.C. § 1983. The clause tells a State that it may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has read this text to trigger heightened judicial scrutiny for public-employment decisions tainted by sex-based animus. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272–73 (1979); *see also Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 597, 601, 605 (2008). Yet the Court has also made clear that this heightened scrutiny applies only if state actors make employment decisions "at least in part '*because of*,' not merely 'in spite of,' [their] adverse effects upon" a particular sex. *Feeney*, 442 U.S. at 279 (emphasis added); *see Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009). And it is hard to see how an employer could be said to have taken an action "because of" an employee's sex if the employer would have taken the same action even if the employee

had been a member of the opposite sex. *See Gross*, 557 U.S. at 176–77. So the Court's constitutional rules for these types of equal-protection claims likely require but-for causation.

Turn to the statutory question: what causation test must public employees prove to recover for an equal-protection violation under § 1983? Under the statute's language, a public employer must "subject[]" an employee to (or "cause[]" the employee "to be subjected" to) the equal-protection violation. 42 U.S.C. § 1983. This language points to but-for causation even more directly. To "subject" a plaintiff to a constitutional deprivation, the defendant must "cause" the plaintiff "to undergo" it. *Webster's New International Dictionary of the English Language* 2510 (2d ed. 1934) (defining "subject"). And to "cause" the deprivation (or cause the plaintiff to be subjected to it) the defendant must "bring" it "about[.]" *Id.* at 427 (defining "cause"). In short, nothing in § 1983 or the Equal Protection Clause seems to leave room for a motivating-factor test.

Historical practice may well confirm this conclusion. The Court has long told courts that we should look to the common law of torts from the time of § 1983's enactment in 1871 when identifying the elements that a plaintiff must prove to establish a § 1983 claim. *See, e.g.*, *Thompson v. Clark*, 596 U.S. 36, 42 (2022); *Manuel*, 580 U.S. at 370; *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986); *see also Dibrell*, 984 F.3d at 1159–60. And it has said that, with few exceptions, the common law of torts generally required a plaintiff to prove but-for causation (previously labeled "causa sine qua non"). *See Comcast*, 589 U.S. at 335; 1 Theodore Sedgwick, *A Treatise on the Measure of Damages* 199–200 (9th ed. 1912). So, as the Second Circuit has explained, both the Constitution and § 1983 would seem to require the plaintiff to prove at least but-for causation. *See Naumovski v. Norris*, 934 F.3d 200, 212–15 (2d Cir. 2019).

All this said, some other cases complicate matters. For one thing, we once suggested that a "plaintiff's race need only be a motivating factor not necessarily the sole factor—in order for the plaintiff to succeed" on an equal-protection claim in the employment context under § 1983. *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000). But we offered no support for this conclusory sentence other than a citation to one case: *Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir. 1988). In *Gutzwiller*, we said that a Title VII claim "mirrors" an equal-protection claim because plaintiffs must make the same "showing" for both. *Id.* at 1325. Yet *Gutzwiller* held that

these two claims require "but for" causation. *See id.* So *Perry* wrongly suggested that *Gutzwiller* used a motivating-factor test. Granted, the Supreme Court (in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)), and Congress (in the Civil Rights Act of 1991) jettisoned *Gutzwiller*'s but-for test in favor of a motivating-factor standard in the *Title VII* context. But neither source undercuts *Gutzwiller*'s distinct use of a but-for causation test in the *equal-protection* context. And besides, *Perry*'s sentence about the motivating-factor standard may well qualify as nonbinding dicta.

For another thing, the Supreme Court has used a burden-shifting approach in other § 1983 contexts. *See Lemaster v. Lawrence County*, 65 F.4th 302, 309 (6th Cir. 2023). Its cases leave no doubt that constitutional claims under § 1983 require a but-for causal connection. *See Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019); *Hartman v. Moore*, 547 U.S. 250, 260 (2006). Sometimes, though, the Court has said that a § 1983 plaintiff need only show that a protected trait or protected conduct (such as race or speech) was a "substantial" or "motivating" factor for some harmful state action. *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 283–84, 287 (1977). It has also said that the burden of proof then shifts to the state actor to establish the *absence* of but-for causation: that the same action "would have resulted even" if the state actor had not considered the constitutionally protected trait or conduct. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 n.21 (1977); *see Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

This approach dates to a pair of 1977 cases decided on the same day: *Mt. Healthy* and *Arlington Heights*. In *Mt. Healthy*, the Court recognized the requirement of but-for causation when a plaintiff claims that protected speech caused an adverse employment action. *See* 429 U.S. at 285–87. It then said the district court "properly" required the plaintiff to show that speech was a motivating factor for the employment action. *Id.* at 287. The Court added that the defendant had the responding burden to prove "by a preponderance of the evidence" that it would have still taken the adverse action even if it had not considered the plaintiff's speech. *Id.* The Court's support for this burden-shifting approach? A single citation to *Arlington Heights*. *See id.* at 287 n.2.

In *Arlington Heights*, the Court considered whether a village had denied a request to rezone an area for a racially discriminatory reason in violation of the Equal Protection Clause. 429 U.S. at 254–55. In general, the Court suggested that if a "discriminatory purpose" had been a "motivating factor" of a legislature's or an administrative body's decision, the judiciary would not be "justified" in giving "deference" to the decision. *Id.* at 265–66. In the end, though, it saw insufficient evidence that race had played any motivating role in the zoning decision at issue in the case. *See id.* at 268–71. In a footnote, it added that *if* the plaintiffs had satisfied this motivating-factor test, the "burden" would have "shifted" to the village to prove "that the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270 n.21. The Court's support for this burden-shifting approach? A single citation to *Mt. Healthy*. *See id.*

Suffice it to say, I have a few questions about this precedent. The Court adopted burden-shifting in a pair of cases decided on the same day. But these cases did not legally justify the approach except through circular citations to each other. *Compare Mt. Healthy*, 429 U.S. at 287 n.2, *with Arlington Heights*, 429 U.S. at 270 n.21. Yet the approach seems to conflict with black-letter law. The Court has repeatedly said that Congress enacts statutes against the "ordinary default rule" that plaintiffs who seek to change the status quo have the burden of persuasion to satisfy all the *elements* of their claims. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005); *see Gross*, 557 U.S. at 177; *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 92–93 (2008); John Jay McKelvey, *Handbook of the Law of Evidence* §§ 29–30, at 50–56 (1898). Defendants, by contrast, carry the burden of persuasion for *affirmative defenses*. *See Schaffer*, 546 U.S. at 57. This default rule explains why the Court has clarified that the well-known *McDonnell Douglas* burden-shifting approach does not shift the burden of *persuasion*; it only shifts the burden of *production*. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–11 (1993). So if but-for causation qualifies as a required element of a § 1983 claim (as the statutory text and precedent seem to suggest), why should the defendant have the burden of persuasion as to its absence?

To be sure, Justice O'Connor did attempt to justify this burden-shifting approach in the Title VII context with an analogy to the common law of torts. *See Price Waterhouse*, 490 U.S. at

263–64 (O'Connor, J., concurring in the judgment). The common law sometimes shifts the burden of persuasion in multiple-cause cases when a plaintiff's harm arose from one of several negligent defendants. *See id.* Think of the "famous tort case" in which two hunters negligently discharged their weapons toward the plaintiff, but only one fired the harmful shot. *Pineda v. Hamilton County*, 977 F.3d 483, 487 (6th Cir. 2020) (discussing *Summers v. Tice*, 199 P.2d 1, 2–5 (Cal. 1948)). After *Price Waterhouse*, though, the Court has repeatedly declined to extend this common-law concept to mixed-motive cases under other employment statutes. *See Nassar*, 570 U.S. at 346–52; *Gross*, 557 U.S. at 173–79. So it is not clear to me why the concept should apply in the § 1983 context.

All this caselaw leaves open a key question: which group of cases should apply to employment-discrimination claims under § 1983? Is it the employment-discrimination cases like *Gross* and *Nassar* that place the burden of persuasion on the plaintiff to prove but-for causation under other employment statutes with similar language? Or is it the speech and zoning cases like *Mt. Healthy* and *Arlington Heights* that shift the burden of persuasion to the defendant to prove the absence of but-for causation under § 1983? We need not resolve these questions here because we can reject Charlton-Perkins's claims on other grounds. But we will have to confront them eventually. And parties should recognize the need to brief the distinctions. They should not simply assume (as the parties have here) that all employment statutes are alike.

Saving these questions for another day, I concur in the majority opinion.